All right, Mr. Johnson, let's give it a moment while everyone clears and you can get ready. All right, you may begin. Thank you. Good morning, Your Honors. My name is Austin Johnson, and with the others at my table here at the Appellant's Table, I have the privilege of representing the plaintiff, who is the appellant here, Waste Management of Louisiana. I want to start by thanking the Court for granting this request for oral argument, making this the first time in the seven-plus years of this litigation that there's been any oral argument on any substantive issue. The Court has a very simple task today, to determine whether Waste Management's allegations were sufficient to plausibly allege RICO violations by the defendant through Mr. Mouton, and whether the summary judgment evidence, which it has been able to gather, was sufficient to raise issues for trial. Stated differently, could reasonable jurors believe what Waste Management alleges and is prepared to prove? Obviously, if they could, the District Court's rulings must be reversed and the case must be remanded for trial. This has been a difficult journey, as it is undoubtedly for most plaintiffs trying to prove a RICO conspiracy. Very briefly, there was an 18-month stay granted to the defendants because they said they were being investigated by the local U.S. Attorney's Office, which stay ended only when that investigation was, in the words of Judge Feldman in the U.S. v. Mouton case which he cited, that investigation was abruptly publicly aborted following the implosion of the U.S. Attorney's Office as a result of suits which were filed in state court by one of these defendants. Second, then, there were three successive 12B6 motions by the defendants over the next three years. No answer and no discovery until almost four and a half years after the suit was filed. Comprehensive resistance to discovery that led to a motion to compel. A first motion for summary judgment at 7 p.m. on the evening before the hearing on the motion to compel. The court thought about the motion, that motion for summary judgment, for four months, decided it was premature, and three months later, there was another motion which was granted and is before you. At bottom, this dispute between these parties is over the issue of causation, which in turn rests upon the credibility of certain witnesses and the inferences to be drawn from mountains of documents. One might have thought that such matters would be for a jury to determine. Such competing issues of causation and credibility are virtually always the exclusive province of the fact finder, not suitable for a no-trial resolution. I think both parties are talking about proximate cause and all these RICO cases out there on proximate cause. I mean, isn't the question, its resolution might not be simple, but isn't the question just whether there was evidence that would show Nagin was bribed? Yes, sir. That would allow a jury to find that? Yes, sir. I mean, then if that is the case, it's clearly a proximate cause of the harm. Well, you could use but for, you could use proximate cause. All those terms are thrown around. We all know what that was like in our torts class. And I don't disagree with you at all. It seems like the Braves are trying to make it like a torts class when it's really just, is there evidence that would allow a jury to find that there were bribes? I mean, is that how you... Of course, that is our position. And I'm going to... So tell me, why was there? If you'll permit me, I'm going to walk through some of these facts that we think the jury could believe that from, if you don't mind, that's what I'd like to do. And then I'll talk about what the district judge did about all this. Throughout the motion practice, the defendants have had some constant refrains here, consisting of just a few things. Pay no attention to Mr. Mouton, though he pleaded guilty to bribery and we paid him some 400... What's the connection between Mr. Mouton and Mayor Nagin? Is there a connection? As far as I can tell, reading the record front to back twice, I see nothing. Is there a single fact that connects Mr. Mouton to the mayor? Yes, actually many. Let me jump to that. That they met, that they talked, that they traded money, what's the fact? Well, let me talk about Mr. Mouton, and if you want to talk about Mr. Mouton, let's focus just on 2006. There's a lot of stuff in this record about Mr. Mouton, just 2006 when all this happened. One of the things that they say is he did almost nothing as to this landfill, that's the defendants, and we used him just for information. So he writes three letters to three different federal agencies. One of them, he copies Nagin's office. Their position is, well, we don't know whether Nagin read that. No, we don't. But could a jury believe that he might have in the middle of Katrina? I would think so, yes. Why did he, Mr. Mouton, then write to the Corps of Engineers asking for a meeting in June and then why did he report back to Hebe at length about that meeting and describe what the information was that was to be covered at that meeting? Counsel, what I'm trying to understand, I understand that Mr. Mouton pled guilty, I believe. He did. And may be in jail today, I'm not sure. I don't think he's in jail, but I would suggest you look at U.S. v. Mouton, which is Feldman's discussion of all that. I understand, but he pled guilty to a crime for his involvement. Yes, he did. So I understand that. What I'm trying to figure out is, as Judge Acosta asked you, we're trying to connect the mayor's decision not to renew this particular executive order in August of 2006 to Mr. Mouton. And I don't — I'm asking you to point to me where that's — I'm still getting to it. But let me just say that, remember, this is in the prism of what a jury could believe from this, not what we've proved today, but from what a jury could believe from what's here. And I know your question is extremely valid, and I'm going to address it. But that was at the 12b-6 stage, right? The 12b-6 — and I'm glad you asked that, because part of the problem legally is that at the 12b-6 motion stage — and there were three of them — the district court decided that there simply wasn't enough plausibility to the pleading about what Mouton did with respect to the landfill, not necessarily with respect to Daggett himself, but the landfill. And then, having taken that sort of out of the case by granting that motion, what's left is then the summary judgment with the rest of the case, and it doesn't appear from what the district judge wrote that he ever took account of the Mouton allegations again. And that's part of the pattern. We're still coming back to Judge Oldham's question of what tied Mouton to the Nagin non-renewal. Correct. All right. In December of 2006 — it's after the fact, but it's 2006 — Mr. Mouton wrote an email to the defendant, Hebe, and he's talking about a federal official that Hebe's going to meet with. And he says, this federal official — and this is a quotation, this is record 8111 — was very, in all caps, happy with my work trying to shut down the Sheff Highway landfill. Now, you may say, does this involve Nagin himself? Our entire point is, it doesn't have to. If you leave — if the 12b-6 decision is wrong, and if there was enough at a pleading stage to say, look, Mouton's part of a big operation here that's ultimately trying to produce the shutdown of the landfill, it doesn't have to be — it doesn't have to be connected to Nagin at that point. And then Judge Engelhardt takes that out of the case and never thinks about it again. And apparently, when you look at his reasons, the reasons are, for this summary judgment, which is really obviously the problem, they're a little over five pages. There's seven lines in, quote, analysis. And he doesn't go back and mention Mouton and the pattern and all that. I noticed that's the second time you've named the district judge by name this morning, and it's 11 times by my count in the blue brief. And I'm trying to understand what the significance is of the naming of the district judge. I thought the briefs all said the district judge. I'm sorry. That's what — I usually just refer to the district judge, and I'm sorry. I understand. And there's no significance to that. OK. None whatsoever. Making sure. The district — the district judge did this, was what I thought the briefs were written. But point well taken. That's not my intent. I mean, district judges have to deal with difficult decisions, and they do it. But our problem with this is that, in the context of first carving out of the case what we'll call the — because the defendants call it that — the Mouton subclaim, he dealt with that, we think, at the pleading stage incorrectly, because it's so rare for that to be granted, because there's lots of stuff, as you pointed out in here, about Mouton connecting him to the landfill. And I've got all that, but I probably won't have time to go through it. And then, that being out of the case and apparently not available in the analysis of the summary judgment, he then finds the summary judgment to be, I guess, easier to grant, I suppose, but still inappropriately so. So our legal complaint — we've got a lot of factual complaints, but there's stuff here that jury could believe, and that's standard. But our legal complaint is that he inappropriately took the 12B6 allegations out, and then we had left a — again, according to the defendants, a, quote, Nagin subclaim. And we think there's a lot of indication that the jury can believe from that. But nonetheless, we were, as we said in the brief, hobbled by the time we got to the summary judgment, because he had already taken that Nagin — I mean, that Mouton stuff out first. That's our legal complaint. And so, then, you say, well, what's — and you ask, because I'm going to — I'll pursue that — you know, what's Mouton's connection to what the mayor did? Well, what would the jury think, for example, of the fact that Mr. Mouton received from the defendants two days after the cease-and-desist order was issued, two days, a $30,000 bribe, the largest sum he ever received as a bribe, from one of the defendant's shell companies after the cease-and-desist order was issued? Is there something connecting that to the cease-and-desist order, other than just the — Other than the unusual coincidence that after he has spent the better part of 2006 writing these letters, having these meetings, all aimed at the landfill, the landfill then gets effectively shut down, and all of a sudden he gets a $30,000 — the largest of all these sums he gets two days later. We don't know why that happened. It's just like — just to jump over to Nagin for a minute, you may recall the facts, and you obviously have studied them, which is great. The facts are that five days before the Nagin re-election campaign, through shell companies — you've read this — they make $20,000 in illegal campaign contributions to Nagin. Five days after the re-election, there's an exchange of emails among the defendants about have you had a chance to set up the Nagin meeting yet? And then the Nagin meeting occurs. Defendant Ward says it occurred. Now, our questions have been, who was at the meeting? What did they say? What did they plan to do? Because thereafter, there is a lot of contradictory information coming out of the mayor's office. And let me just mention that very briefly, since we're on that topic. But to clarify, the alleged bribe here is the campaign donations. Of Nagin, yes, what we know about now. And of Bhutan, obviously, who participated in this process. That's actually clarified. The bribes that are at issue with respect to the mayor's decision not to renew the executive order in August of 2006. And those are, as I said, the ones we know about now. Let's just put it that way. Now, you know, one of the things, and this, I think, has triggered your question, and I appreciate the question. You know, one of the things that they've said all along is, gee, the mayor never said the suspension would go longer than six months. You know, you're talking about something that was going to expire on its own. He never said that. I want the court to look at the executive order. You're absolutely right. But the statement that they make is, he never said the suspension would last longer than that. But let me just walk the court through this. At about the same time, because this has to be permitted by the DEQ as well, zoning locally, the DEQ, they have to file an emergency disaster cleanup site request. It's on February the 14th, five days after the executive order. The DEQ asks on this form, requested time span for activities. The proposed time span will be the duration of the Hurricane Katrina disaster cleanup efforts at this time estimated to be 12 months. And I'm sorry, who's responsible for this form? This, it's Nagan's signature is on this. Who's the contact person? The contact person is the DEQ. And when you deposed Mayor Nagan, did you ask him if he signed this or if it's auto-penned? Yes, at record 5311. And he personally signed this? He says he signed it personally. So his view in February is estimated? He's telling the DEQ the cleanup is estimated at this time to be 12 months. Now, our colleagues at the other table quote a part of this twice in their brief. They say the proposed time span will be the duration. They leave out at this time estimated to be 12 months. We think that's very important. If he, quote, never said the suspension would go longer than six months, actually he probably said that and he signed that separately. And so time goes on, and he's issuing a press release on June the 30th saying the site is clean and good, the test results are good. He tells the council on June 27th the state of the emergency continues to exist. So here we are in late June coming up to some very important dates. And then if you look between July the 14th and August the 10th, Mayor Nagan and his city attorney and the DEQ are going back and forth in a process of correspondence that is totally contradictory. And actually from that correspondence on August the 11th, DEQ is convinced that the mayor is okay with it continuing. FEMA on a Saturday sends an email August the 12th and says, good, we'll continue funding, and then by Monday morning. Hold on, Council. I don't mean to interrupt, but I want to make sure that we get it clear before we move on through the timeline. The conversation from the mayor's office after the expiration or around the expiration, after he declares that we're not going to renew the disaster declaration, is we aren't opposed. We, the city council, or we, the mayor's office, it's not obvious to me, don't oppose DEQ permitting the site, which they obviously could have done. But at that point in your timeline, the mayor had already announced that he was not going to renew the executive order, which by its plain terms said it would expire in August of 2006. He had, about a month ahead of time, the affidavit in the state court suit, which, of course, undermines the argument at this table that, oh, the city attorney really did this. The mayor didn't do it. The mayor had already done it. And I want you to look at the letter that the city attorney sends to DEQ on July the 10th. I'll give you a cite in the record to it in just a second when I come up to it. It is August the 10th. You can find it in the record at several places. Record 8358 is such a place. She's trying to explain what it is that they meant by saying they're not going to renew. And she says, please be advised that allowing this executive order to expire is not intended to and should not be construed as an expression of the administration's opposition to LDEQ's permitting. But then the last sentence of that paragraph is important. However, it is still undetermined whether or not the operation of an emergency temporary C&D landfill permitted by LDEQ would be in violation of the Comprehensive Zoning Ordinance. So she's saying we don't know. DEQ takes that as approval. FEMA says on a Saturday email we'll continue to send money. This is great. That's Saturday. And by Monday morning at 10 a.m., the mayor has sent out an email that says, everybody get to my office at 10 a.m. And four hours later at 2.30, the cease and desist order comes out. Now, why did all this happen the way it did? That's what we've been trying to find out. And we think that's a jury issue. And I see that my time on this part is just about to expire. All right, you've saved a few minutes for rebuttal. Thank you. All right, we'll now hear from Mr. Flanagan. May it please the Court. The district court's rulings were correct. Waste management could not allege or in one case show a causal connection between alleged predicate offenses and the closure of a Chef Mentor landfill. The district court didn't plow any new ground or decide any res nova questions. He simply applied the settled rule that whether under Rule 12 or Rule 56, speculation and the mere possibility of causation is insufficient. I'll begin, if I may, with the Henry Mouton ruling under Rule 12b-6. Mr. Mouton, as you know, was a Lafayette-based commissioner on the Wildlife and Fisheries Commission. That entity set hunting and shrimping seasons in Louisiana. Under Henry group, to get an award of damages, waste management had to allege a plausible causal link between payments to Henry Mouton and the closure of its landfill. It had always alleged from the very beginning that the closure was due to action or inaction of Ray Nagin. So as Judge Oldham's questions pointed out, that required waste management to allege some causal connection between Mr. Mouton and Mr. Nagin. Didn't Mouton have connections, though, with the environmental state, environmental agency, and the federal? That was argued. He certainly wrote letters to them, Your Honor. He wrote letters to the EPA, the Corps of Engineers, the U.S. Fish and Wildlife Service, and there was no allegation and ultimately, with the benefit of full discovery, no evidence that any of those state or federal agencies did anything to close the landfill. There's not even evidence that they took Mr. Mouton's sign and pressured Ray Nagin to withdraw the emergency authorization. But there's no discovery. I mean, to the opposing point, there's no discovery into these Mouton allegations, obviously, because they get dismissed early. I'm glad you asked the question, Your Honor, because actually there was full discovery and there's no issue on appeal as to the denial of discovery. We actually asked the district court, since he found the Mouton allegations wanting, in terms of a predicate offense, to strike them, and he refused. He said, nope, they will remain in the complaint. So the suggestion that the Mouton allegations were surgically removed, put on the side, and into a box is an incorrect one. They got full and broad discovery relative to Henry Mouton. In fact, they asked for and obtained an extra two hours. So we had a nine-hour deposition of Mr. Mouton. My clients received hours of questions about Mr. Mouton. Documents were exchanged relative to all e-mails, faxes, payments to Mr. Mouton. So there was full discovery, which is why Mr. Johnson can argue now. Based on the record evidence, again, it's not there, but he's citing Mouton evidence. He got full discovery on that. Discovery, though, confirmed that the allegation was meritless, and certainly had they uncovered something in discovery, they would have amended their complaint to put it in there. Discovery confirmed, and Judge, you alluded to this, they never met, they never spoke. There was no influence. One didn't know the other. Mr. Mouton candidly acknowledged in his deposition, I don't know Ray Nagin, and I have no influence over him. So the Mouton ruling was correct. There was no causal link, but, again, the idea that this claim was permanently removed from the case for any and all purposes is not correct. Let's talk about the Nagin ruling, its summary judgment. There's some evidence in the record that the regulators were surprised. Other people said there was this great need for debris removal, which needed landfills. Is there any reason in the record that's been stated why the waste management wasn't allowed to continue for the full 12 months? Even if I understand your argument that they didn't have a right to because it said six months. So putting that aside, why not, what was the reason they weren't allowed to continue? The reason was because ordinarily in New Orleans, zoning is a matter for the city council. And the city council had been agitating for a while. They didn't like this state of emergency. It's quite an extraordinary law. It lets the mayor usurp council powers, override ordinances, at least during the locally declared state of emergency only. After that period is over, the mayor's power evaporates. Well, the city council itself had passed a unanimous 7-0 resolution in April 2006 before the campaign contributions, decrying allowing this landfill to come in without going through the ordinary process, public hearings. You see, this site in New Orleans had been eyed by landfill developers for years. They tried in the late 1990s. The council refused a conditional use permit. Waste management was looking at it again in 2001, years before Katrina, had it under option. And so when this Katrina struck, they saw an opportunity, hoped to get an exemption. Your Honor, you asked about the need. The need existed on February 9 of 2006, and the mayor said, I'm giving you six months. The fundamental problem was waste management didn't know it. There was a miscommunication. Again, this is months before any campaign contributions. And waste management testified that they were shocked to find out that the mayor, pre-contributions, had limited the exemption to six months. And ultimately, they are presenting an argument here based on what I call the reversal narrative, that before the contributions, the mayor was going to give them a multi-year zoning exemption, sidelining the city council for that whole time. After the contributions, they say suddenly and inexplicably, the exemption was limited to six months. Did council have a hearing on this at all? I'm sorry, Your Honor? Did council have a hearing on this? It did not, because ultimately, even though the agreement that waste management signed in February 2006 required them to apply for a conditional use permit, that's the zoning permit needed to put a landfill in this light industrial district, they didn't do it. And they didn't do it in April when they found out about the order. They didn't do it in June when, on an internal meeting agenda, they wondered, how do we keep it open beyond six-month order? They finally applied for the conditional use permit only after receiving the cease and desist letter on August 14 of 2006 because they knew. They had no support, and it's undisputed, they had no support in the city council. But when they tell you that waste management understood it would have a long-term zoning exemption, it's important to remember that their understanding was born of error. They didn't realize that something that is independent of the Riverbirch event. Didn't the city attorney, didn't the state regulators and others think this was going to last beyond that period? It did not. The city attorney, in fact, Peña Moses-Field, who was not implicated in any alleged wrongdoing, she said, no, it was a matter of six months was up, and then it's a council decision. What about her August 10th letter? What was going on there? What she said was, and again, there was a colloquy back and forth with the DEQ, and the DEQ wanted a landfill. And they didn't care much about the internal city process. And when the city wrote to them and said, well, look, we're only saying not that we oppose a landfill, but that the mayor's exemption is over. They need to go to the council. Under our law, the city council is the one that issues these permits. And the mayor, post-contributions, said, I don't oppose the landfill. They need to go to the council, though. And, in fact, the mayor could not have given them this multiyear zoning exemption. He didn't have the power to. But he has the power to give the additional six months up to the year of emergency. His power terminated on December 3 of 2006. So he has the power for an additional six months. He could have done it. There would be no legal bar. But the point is, if we're going to have a reversal narrative, I think it's fair to ask waste management, where in the record did the mayor take the position that six months was just a start? We asked their 36th representative, Tim Hawkins. He was involved in various meetings. Did the mayor tell that to you? He said no. He didn't, but other people were involved in those meetings without me sometimes. You might want to talk to them, Ms. Olson, Mr. Marks, and Mr. Fauche. And so we deposed them, and none of them could say that the mayor ever indicated, promised, expected that six months was just a start again. To the extent there was a need there in August noted by the DEQ, there was a need in February, and the exemption was limited to six months. And the council was clamoring for that to end. They were clamoring for the state of emergency to end because, again, it sidelined them. I just want to make a note. We do have an issue that the district court did not need to address on the constitutionality under state law of Title 29, which would allow in what's called a home rule charter jurisdiction to allow a mayor to usurp council's functions. That's just out there. But even on this record, there's no evidence from anyone, not from city personnel. Again, Ms. Moses-Field was questioned. She said, no, there was never any expectation or promise it would last more than six months. What kind of inference could a jury draw from the fact that the campaign contribution was made through shell companies? Your Honor, I'm glad you asked that question because in Louisiana, a bribe is a unilateral offense. So someone can commit a bribe with a corrupt intent in giving money, and yet they could never have had a conversation, much less an agreement on a quid pro quo. So I would acknowledge that would be a factor tending to the existence of an improper payment. Now, I want to emphasize giving too much money and not disclosing the amount of money is not a predicate offense in the RICO. So they would have to have shown as well this corrupt intent. But it says nothing about Mayor Nagin's side of the equation. And that's where the judge found it. You emphasize that he denied taking a bribe. I mean, it would be pretty shocking if after years of fighting his criminal case in the deposition, in this case he already came clean. I mean, he'd be subject to a little bit of impeachment, don't you think? Your Honor, it may be. And frankly, if this were as simple as our clients and Mayor Nagin denying a quid pro quo, well, we wouldn't have used quite as much of our word count as we did. But what about the concealment? I mean, the fact that they're using shell companies, it's common in criminal cases if you're hiding payments, that that allows the argument or inference that you're hiding something because it's something untoward in the money transfer itself. I would acknowledge the point in general, but it tends towards what the River Birch defendants did. It doesn't say anything about Mr. Nagin. It's not as though Mr. Nagin was in a room and told — No, I understand that. But I don't think that by virtue of a totally unrelated conviction affirmed by this court, someone can assume that there's almost a presumption of causation. Again, in this case, I think that causation would require something from Mayor Nagin. We're giving them the benefit of circumstantial evidence. We're not hardly asking for a confession. But to have a reversal of position, to have causation, which again, the criminal RICO statute wouldn't require, but civil does, we need to show at a minimum he would have done something else but for the causation. If he never said six months is just a start, not even to city employees who could have been deposed. Well, there's a — I noticed in the blue brief that there's a statement that the original executive order, the February 9th one, was never recorded. And this seems an inconsistency, and hopefully you can resolve it. In the executive order itself, it says that Waste Management has agreed to seek this permit. So it sounds like there was consultation and that they're aware of what's going on. And on the other hand, they say we had no idea and it wasn't properly recorded. I'm not familiar with the way executive orders are recorded from the mayor's office. But is it true that it was not properly recorded? They could fairly be surprised by it. Your Honor, the testimony in the record, as I recall, is relying upon a Hawkins affidavit who said Waste Management had people who checked after the fact and they didn't see it published, which I understood to mean published in the official journal. There's no record evidence either way as to whether it was published in the official journal, which at the time was probably the New Orleans Times-Picayune. But we know that the city council knew about the existence of this executive order 0603 because on April 6, they passed a unanimous resolution condemning it. And we know that the mayor, obviously, in his office were aware of it because in May, again, before the contributions, they amended that executive order, essentially to suspend it for a couple of days to allow some environmental testing. Was there a public meeting before this city council resolution in April? It was at a public meeting, yes, Your Honor. And so, again, we have this idea that, again, well, maybe six months was just a start. The city council didn't think so. Waste Management didn't think so. Again, they're meeting agenda. How do we keep it open beyond six-month order? I want to mention something I heard Mr. Johnson say that may have been just a mistake or maybe I misheard him. I thought he suggested that there was a meeting between Mayor Nagin and my clients after the contributions, and that is flatly incorrect. There was no meeting. There's e-mails suggesting there was an effort to try to talk to the mayor about whether this Chef Menteur landfill could accept asbestos-containing materials. And usually that has to go in a subtitled landfill, one that, as you can imagine, is built and engineered to take potentially toxic substances. But there's no evidence whatsoever that the effort to reach out to the mayor was successful. So not only did they not meet, they didn't speak. There's no evidence whatsoever to that effect. So I just wanted to clarify the record on that. I appreciate that clarification. But isn't there evidence, the letter that goes from at least some of the defendants to the mayor's campaign office does suggest that they communicate directly, right? That is, the defendants and the mayor. I recall the letter was a rejection of a solicitation to attend the fundraiser for the mayor. And in that letter, which, again, as you can imagine after many years, it wasn't sure was it even sent. But there was a rejection, a declining of an opportunity to contribute. And the statement was, we have made our contributions in the past to the mayor on a direct basis. So we had no suggestion that there had been any discussions about the Chef Menteur landfill because the record is absolutely clear that never happened. But there is evidence that the mayor was directly communicating because it isn't one of the solicitations prior to the re-election. It was, yes, yes. There definitely was a phone call from the mayor about two weeks before the election to Jim Ward. The mayor suspected that, again, he didn't have a clear recollection. He had been given a list of people to call. And he called Jim Ward who thought it was a prank and said, I need your help on the campaign. I'm just calling people. They later discussed it, decided to make a contribution. There was no suggestion there was any discussion about the Chef Menteur landfill. And on that point, I just want to point out, we heard my friend on the other side say that at various points in June, for example, the mayor said that the landfill was safe. Well, this is after the contributions. The letter in August to the DEQ, we don't oppose the landfill. We're just saying that the mayor gave six months. This is after the contributions. So not only do we not have a reversal in terms of promising more time, we have a mayor who is still saying the landfill is fine. I don't quarrel with the DEQ's justification for it. And the landfill was safe. Whereas, again, if this reversal narrative had any facts, you would think the mayor would have changed his tune. That's what does make it look like a fairly abrupt change. Well, Your Honor, the idea that it was an abrupt change, I think, presumes that he intended something else. And, again, from February 9, six months was in place, and there's not a single witness who can say, well, no, that was a start. Now, there was some talk about this DEQ form. The evidence is undisputed. And, first of all, that is a DEQ form. That is part of the state-level approval of a landfill. And Peña-Moses Field testified without contradiction. Local permitting and DEQ's process are two separate things. One doesn't have anything to do with the other. But it is a representation from the city. It is a representation to the city, to the DEQ, saying, open it up. We understand you have a need. But it is not a representation, first of all, that the mayor changed his mind just five days earlier from Executive Order 0603. It's not a representation about whether this is going to require a conditional use permit, which waste management agreed to do. The DEQ didn't think that they were one and the same. The DEQ was aware of the executive order from the beginning, and they knew there was no suggestion that this was a tacit repeal, that the mayor silently changed his mind without telling anyone. Again, the executive order was amended in May to facilitate some environmental testing, amended by name. This amends Executive Order 0603. If the city was going to amend the executive order to suspend this operation for three days to facilitate environmental tests, how unreasonable is it to think that it would have been changed from six months to a year or some indefinite period, but no one would have noted that? And not only that, there's not a single shred of documentation on the waste management side. Meeting notes, for example. Nor when the mayor said, or when they found out, rather, there was an executive order in place that limited to six months, you would imagine there would be some panicked emails. How could this happen? We invested a lot of money in this landfill. We were told. Not a single document to suggest that. There is evidence, isn't there, that the $20,000 contribution was made, at least in part, to influence the mayor to extend the order. Well, Your Honor, I dispute that. That was not the intention. And there was no thought to contribute until the mayor called and requested. And the thought was, sort of like in McDonald v. United States, we want some general goodwill. We have a problem because they were a contractor. They took city garbage pre-Katrina. If we have a problem, we want to make a phone call and have our phone calls returned. I mean, they did precipitate that lawsuit from the citizens trying to close it, did they not? You mean River Birch? Yeah. There is evidence that River Birch was financially involved in a lawsuit by some New Orleans East citizens. And the citizens in New Orleans East, it's the old NIMBY concept, not in my backyard. They had resisted this landfill before, and they saw it coming after Katrina when that community, it was a Vietnamese refugee community, was very heavily impacted by Katrina. And they were irate. And, yes, River Birch did financially support them, but the point is that's not a predicate act. When Nagin made the solicitation call for the campaign donations, was it his idea to do multiple donations through shell companies and to exceed the campaign caps, or was that your client's idea? Not at all. There's not a shred of evidence that Mayor Nagin had any clue. He didn't ask for an amount, much less by company. He just said, I need your help on the campaign. I see my time's up. We would ask the court to affirm the district court's well-reasoned rulings. All right. We have three minutes of rebuttal. Thank you. Let me address right away this contribution time issue about when they contributed and when they didn't. And there's a letter in here in responding to Nagin's request from Mr. Ward that says, I just want to remind you at the campaign that we gave $40,000 last year. I hadn't heard anything else about that, but the letter's in there. And it says, yeah, we gave $20,000. We sent it over directly so you'd know it was from us. And we gave $40,000 last year. And that's in the letter. You'll see it. And then the question about the use of Mr. Mouton and the use of Nagin that's come up frequently, something I didn't mention, and that is that if we think there's not really any connection among all these things, I'm wondering why the defendants reimbursed Mr. Mouton about a month after all this happened for his computer. He had been advised to deep-six his computer. He confirmed that it had a lot of information on it about all these letters and back and forth and e-mails. He deep-sixed the whole thing and wrote him a note and said, I'd like to get a check within 24 hours for $3,000 because I had to get a whole new computer system. And they sent it to him. I think that's pretty significant. Then I heard about this meeting. And let me just say about the meeting that we're talking about, it's right after the campaign, the e-mails go back and forth. Have you been able to set up the meeting with the mayor? And then Mr. Ward confirmed, and I'm going to give you the site here, confirmed that there was such a meeting. It's on page 8474 is what I have in my mind, but I'll find it here in a minute. But Mr. Ward confirmed there was a meeting. And we don't know. It is 5374, I'm sorry, record 5374. Mr. Ward says there was a meeting. That is our question. Who was at it? We don't know. What was discussed? We don't know that. I only have a minute, but I want to close with this thought. I want the court to focus on the present situation. About 50 years ago, a member of this court, Judge Brown, in a famous quotation declared an argument by a defendant to preserve a summary judgment too fine and too fast. So it is with the arguments of our colleagues at the other table. They're very skilled, and their skill has served their clients well over the seven-year-plus life of this litigation to date. It has permitted this litany of facts and inferences from being the subject of open scrutiny and judicial discussion such as we've had today. But now we are truly at a crucial and possibly final intersection. This is the last chance that the plaintiff will have to present its case to those who are supposed by law to be the ones to hear it. The crucible of the jury is also the last chance for this judicial system to find out the truth after the abrupt end of the criminal investigation. I urge the court to do what is perfectly obvious in terms of this record, which is there is enough for a jury to hear this case. There was enough in the pleading to survive a 12 v. 6, and what's happened here should be put before a jury to determine all of these factual questions that both Mr. Flanagan and I have raised in front of you today. Thank you very much. Thank you to both sides. Court is adjourned until 9 a.m. tomorrow.